**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | |
|---|---|
| **PAUL GREGORY HOUSE**, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| | )      **Case No. 3:96-CV-883** |
| vs. | )      Mattice/Carter |
| | )      DEATH PENALTY CASE |
| **RICKY BELL**, Warden | ) |
| | ) |
| Respondent | ) |

---

### AMENDMENT TO AMENDED COMPLAINT

---

COMES NOW Petitioner, Paul Gregory House, by and through undersigned counsel, and, pursuant to the agreement of the parties, amends his amended complaint to incorporate the following facts and arguments:

**I.     Facts common to all causes of action:**

In *House v. Bell*, ___ U.S. ___, 126 S.Ct. 2064, 165 L.Ed. 2d 1 (2006), the Supreme Court of the United States held:

> In certain exceptional cases involving a compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition. See *Schlup v. Delo*, 513 U.S. 298, 319-322 (1995). After careful review of the full record, we conclude that House has made the stringent showing required by this exception, and we hold that this federal habeas corpus action may proceed.

*House v. Bell*, 126 S.Ct. at 2068.

The Court held that the record reveals the following:

1.     false evidence connecting Mr. House to semen stains found on the victim's clothing, *id.* at 2079;

2.     conflicting evidence regarding the degradation and source of blood stains found on Mr. House's blue jeans, *id.* at 2079-80;

3.     evidence confirming that blood had leaked from the sample vials of the victim's blood, *id.* at 2080;

4.    <u>At best</u>, there was poor evidence control of Mr. House's blue jeans and the sample vials of the victim's blood, *id.* at 2082;

5.    the Styrofoam box containing the victim's blood had been opened, certain items removed, and then resealed before arrival at the FBI crime laboratory thus creating an opportunity for spillage, *id.*;

6.    the FBI did not strictly adhere to its claimed policy of always noting and returning contaminated evidence, *id.*;

7.    the State's blood spatter expert's opinion did not refute House's theory that the "folding or creasing" which would have taken place in preparation for transport was also consistent with the intermittent blood stain pattens, *id.* at 2082;

8.    The absence of blood stains on Mr. House's shoes was inconsistent with Mr. House's guilt. *id.*;

9.    "It seems permissible, moreover, to conclude that the small size and wide distribution of stains . . . fit as well with spillage in transport as with wiping and smearing from bloody objects at the crime scene, as the State proposes. *id.*;

10.   Agent Scott's observation of "reddish brownish stains [he] suspected to be blood" did not refute Mr. House's evidence especially in light of the extensive non-blood staining on the jeans. *id.*;

11.   "The evidentiary disarray surrounding the blood taken together with Dr. Blake's testimony and the limited rebuttal of it in the present record, would prevent reasonable jurors from placing significant reliance on the blood evidence, *id.* at 2083;

12.   "[w]hereas the bloodstains emphasized by the prosecution seemed strong evidence of House's guilt at trial, the record now raises substantial questions about the blood's origin," *id.*;

13.   "House presented troubling evidence that Mr. Muncey, the victim's husband, himself could have been the murderer," *id.*;

14.   Mr. Muncey had a history of physically abusing the victim, *id.*;

15.   Mr. Muncey assaulted his wife on the night of her murder, *id.*;

16.   Mr. Muncey attempted to arrange a false alibi for the night of the murder, *id.* At 2083-84;

17.   Mr. Muncey confessed to Kathy Parker and Penny Letner near the time of Mr. House's trial that he had killed his wife, *id.* at 2084;

{2}

18.    Ms. Parker's and Ms. Letner's testimony was corroborated by the testimony of Pam Luttrell regarding the cause for the fight, the "opportunity" testimony of law enforcement official Dennis Wallace, the testimony of Dr. Cleland Blake regarding the cause of injuries to the victim, the evidence of Mr. Muncey's attempt to construct a false alibi, the evidence of his undisclosed fight with his wife on the night of her murder, and Mr. Muncey's false testimony regarding his history of assaults against the victim. *id*. at 2084-85;

19.    "Parker's and Letner's testimony is not comparable to the sort of eleventh-hour affidavit vouching for a defendant and incriminating a conveniently absent suspect that Justice O'Connor described in her concurring opinion in *Herrera* as "unfortunate" in capital cases; nor was the confession Parker described induced under the pressure of interrogation. The confession evidence here involves an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie," *id*. a 2085 (emphasis supplied and citation omitted);

20.    [Parker's and Letner's testimony] has more probabtive value than, for example, incriminating testimony from inmates, suspects, or friends and relations of the accused," *id*.;

21.    the injuries on Mr. House's body submitted as evidence of guilt at trial were too old to have been related to the offense and a particular injury submitted as evidence of a blow to the victim was inconsistent with striking someone, *id*.;

22.    "[t]he central forensic proof connecting House to the crime - the blood and the semen - has been called into question, and House has put forward substantial evidence pointing to a different suspect," *id*. at 2086.

The Court then held, because of these facts, "House has satisfied the gateway standard set forth in *Schlup* and may proceed on remand with procedurally defaulted constitutional claims." *Id*. at 2087.

**II.    Claims**

**A.    Prejudice**

**1.    The materiality/prejudice prong of Petitioner's claims of prosecutorial misconduct and/or violations of *Brady v. Maryland*; *Giglio v. United States*, 450 U.S. 150 (1972); and *Napue v. Illinois*, 360 U.S. 264 (1959) (Claims 39, 40, 41, 42), and the prejudice prong of Petitioner's claims of ineffective assistance of counsel (Claims 55, 57, and 58) were established as a matter of law when the Supreme Court of the United States held that Mr. House had**

{3}

**demonstrated his actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995).**

The effect of the holding in *House* is clear. Under *Schlup*, Mr. House has already made a showing much greater than that required to establish prejudice under *Strickland* and/or materiality under *Brady*. *Schlup* 513 U.S. at 327, citing *Strickland v. Washington*, 466 U.S. 666, 694 (1984) and *United States v. Bagley*, 473 U.S. 667, 682 (1985), *See also Hays v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005); *Hargarve-Thomas v. Yukins*, 374 F.3d 383, 389 at fn.4 (6th Cir. 2004).

The only questions which the court must determine before granting summary judgment in Mr. House's favor are whether the record now before it demonstrates that the State of Tennessee failed to disclose exculpatory information under *Brady* and/or presented false evidence in violation of *Gigliio* and *Napue*, whether the State's conduct rendered trial counsel's performance deficient under the first prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and/or whether trial counsel's performance was otherwise deficient under the first *Strickland* prong.

**B.     The record demonstrates that the State of Tennessee failed to disclose exculpatory evidence and/or presented false evidence.**

**1.     Law enforcement report indicating that Hubert Muncey Jr. had sexual intercourse with his wife on the morning of the murder.**

Not a single reasonable juror in the entire United States would have voted to convict Mr. House of the murder of Carolyn Muncey had they known all the evidence now before the district court. Among this evidence is DNA test results establishing that the semen stains found on Ms. Muncey's clothing (which were attributed to Mr. House at the time of trial through prosecution testimony and argument) actually came from the victim's husband, Hubert Muncey, Jr. This new evidence went to the very heart of Mr. House's theory of defense. Trial counsel attempted to provide House's jury with an innocent explanation for what the Supreme Court of the United

{4}

States observed was a critical part of the prosecution case. Indeed, trial counsel pointed out that the FBI Crime Laboratory had failed to perform a simple test in order to eliminate Hubert Muncey, Jr. as the donor of those semen stains. (R. 4, T.T. p. 956-958, 1271-1273)

Obviously trial counsel did not have the benefit of presenting DNA evidence to conclusively establish the falsity of this important aspect of the prosecution's case in 1986, however, the record already before the district court demonstrates that law enforcement had in its possession critical evidence which would, in and of itself, have bolstered trial counsel's argument that the semen stains came from Hubert Muncey, Jr.. As importantly, this evidence afforded trial counsel grounds to demand that Hubert Muncey Jr. submit to the additional testing which the prosecution conveniently did not request from the FBI Crime Laboratory.

On November 25, 1985, Hubert Muncey Jr. was interviewed by Agent Charles Scott of the Tennessee Bureau of Investigation. During that interview, Mr. Muncey informed Agent Scott that he had sexual intercourse with his wife on the morning of her murder. Agent Scott reduced that interview to a memorandum and provided a copy to counsel for the State, specifically Assistant District Attorney General Sonny Sexton. Trial counsel testified that the prosecution failed to turn over this report and about it's significance:

> Q.  [by Mr. Pemberton] If you would, flip two documents over and it should be a handwritten note dated 11-25-85 from the TBI file. It should start out William Hubert Muncey, Union S.O. You see that document?
> A.  [by Mr. Burks] Yes.
> Q.  Have you had the opportunity to see that document prior to me showing it to you earlier?
> A.  No.
> Q.  Short document, anything of importance in that to you?
> A.  Yes. In the sentence where it said the last time he had sexual relations with his v, I guess victim, was Saturday morning before I left for work, the same day she was found missing.
> Q.  During the trial the state of Tennessee was talking about semen here. I mean semen on various articles of clothing. They put on Agent Bigbeee to talk about semen and secretor status and Mr. House. That was a big issue?
> A.  <u>It was. They said that they couldn't say exactly when the semen was deposited on the garment and so, certainly, information that Mr. Muncey</u>

{5}

> had had sex with his wife the very day would certainly, I think, be
> important to suggest that he could have been the secretor

R. 275, H.T. Vol. II, at 156-157.  Emphasis supplied.

Agent Scott's interview of Hubert Muncey, Jr. should have been disclosed under *Brady v. Maryland*.  As noted, trial counsel's entire explanation for the damning semen evidence found on Carolyn Muncey's clothing was focused on the possibility that this semen may have come from the victim's husband.  Agent Scott's report reveals that the victim's husband had informed the prosecution that he indeed had sexual intercourse with his wife the very morning of her murder.  In addition, the report would have provided a factual basis for trial counsel to seek a court order demanding further testing of the semen stains and/or Hubert Muncey Jr.'s saliva or other bodily fluids.  As Mr. Burks testified under oath before this Court, the State of Tennessee failed to turn over this report.  The report would have provided compelling evidence supporting trial counsel's theory of the origins of the semen stains found on the victim's clothing.[1]  The State's failure to turn over the report violated *Brady* and it's introduction of the irrelevant and prejudicial semen stain evidence violated *Giglio* and *Napue*.  Because prejudice has been established, relief is warranted.

> **2.** **Law enforcement report indicating that Kathy Parker possessed information relevant to trial counsel's theory that Hubert Muncey Jr. was the person actually responsible for the murder of his wife, Carolyn Muncey.**

On July 15, 1985, Special Agent Ray Presnell of the Tennessee Bureau of Investigation interviewed Kathy Parker.  Agent Presnell executed a memorandum indicating that, during that interview, Ms. Parker informed Agent Presnell that her

---

[1]Indeed, as we now know from DNA testing, it would have provided compelling evidence of the <u>truth</u>.

{6}

brother had overheard Hubert Muncey, Jr. tell some men from Washburn, Tennessee,

that his wife was at home and that the men could go get her if they desired because he

didn't care anymore. She stated that she herself overheard a similar conversation at Mr.

Muncey's father's home on the following day. A copy of that memorandum was

provided to Agent Charles Scott and District Attorney General Paul Phillips.

Charles Burks, Esq., Mr. House's trial counsel, testified that the prosecution

failed to turn over this report and about its significance:

Q.    [by Mr. Pemberton] The third page should be a Tennessee Bureau of
       Investigation memorandum from Special Agent Ray Presnell and the
       subject is Carolyn Muncey. It is in respect to Kathy Parker. Is that the
       one that you have in front of you?
A.    [by Mr. Burks] Yes.
Q.    All right. Prior to my office showing you that particular memorandum, had
       you ever seen that before?
A.    I don't believe I have ever seen it before. It's been 13 years. There's a
       statement in here that leads me to believe that I would have recalled this
       particular report. That is the statement that she attributes to Little Hube
       [Hubert Muncey, Jr.] at the bottom of the second full paragraph where it
       says, "Hube said she was at home, that they could go get her if you want
       to. I don't care any more."
Q.    Are you talking about the three men from Washburn?
A.    Yes.
Q.    If you had obtained that report, if the state had given you that report, what
       would you have done with that?
A.    <u>I would have pursued this witness to try to find out any information that I
       could as to the context of that statement and tried to introduce that
       testimony at trial.</u>

R. 275, H.T. Vol. II, at 148-149. Emphasis supplied.

This report should have been disclosed under *Brady v. Maryland*. The

information attributed to Ms. Parker by Agent Presnell was clearly relevant to trial

counsel's argument that Ms. Muncey's husband, Hubert Muncey Jr., was an abusive

husband, that they had been having serious marital problems immediately before Ms.

Muncey's murder, and that Ms. Muncey was scared of him. (R. 4, T.T. p.1085-1097,

1274) It fit hand in glove with trial counsel's attempt to direct the jury's attention to a

{7}

more likely suspect in Ms. Muncey's murder.  It would have rebutted the prosecutor's attempts to mislead the jury during the cross-examination of Ricky Green, the victim's brother, by suggesting that any marital difficulties between Ms. Muncey and her husband had long since been resolved.  (*Id.* at 1093)  More importantly, as we now know, Ms. Parker had even more valuable information by the time of Mr. House's trial, to wit, that Hubert Muncey Jr. had confessed to committing the murder of which Paul Gregory House stood accused.  *House v. Bell* at 2084-85.  The State of Tennessee failed to turn over this report identifying Ms. Parker as a person with valuable information, and Ms. Parker was never discovered by trial counsel.  The State's failure to turn over the report  violated *Brady*.  Because prejudice has been established, relief is warranted.

> **3.** **Law enforcement report indicating that no blood was found on the tennis shoes worn by Mr. House on the night of the murder.**

Following Mr. House's arrest, law enforcement located the tennis shoes worn by Mr. House on the night of Carolyn Muncey's murder.  Unbeknownst to Mr. Burks, these tennis shoes were submitted for presumptive testing for human blood.  On or about January 30, 1986, the Tennessee Bureau of Investigation issued a report indicating that no trace of blood whatsoever was found on Mr. House's tennis shoes.

Charles Burks, Esq., testified that he did not receive a copy of this memorandum and that it would have been extremely significant to House's defense at trial:

Q.    [by Mr. Pemberton] Now Mr. Burks, if you would turn in the book that you
have to exhibit 6(a).

                                        *    *    *

A.    [by Mr. Burks] I have one that says laboratory report.
Q.    On that laboratory report there are two exhibits, one blue tennis shoe,
actually three, one blue tennis shoe USA Olympics, right foot.  One cloth
identified as a dish towel and number three is one blue tennis shoe, USA
Olympics, left foot.

{8}

A.      Yes.
Q.      The results of that laboratory report say what?
A.      That the serological testing report tested failed to indicate the presence of
        blood on 1,2, and 3.
Q.      Did you have this report prior to trial?
A.      I don't recall ever seeing this report.
Q.      If you had this report, what would you have done with it, if anything.
A.      I would have asked the serologist about the report and the results of the
        report to --

                                        *    *    *

A.      You asked me why it was important.  Only to try to show the jury that
        there was no blood on the shoes they alleged he was wearing at the time
        of this offense.
Q.      May I approach the witness, Your Honor?
(THE COURT): Yes sir
Q.      There was blood down here in this area of the blue jeans?
A.      Yes.
Q.      And indeed the tennis shoes that was, were introduced showed no blood
        on the tennis shoe?
A.      According to the report, that is correct.

R. 275, H.T. Vol. II, at 141-144.

        This report should have been disclosed under *Brady v. Maryland*.  As noted by

the Supreme Court of the United States, the evidence of the absence of blood stains on

the shoes worn by Mr. House on the night of Carolyn Muncey's murder corroborated an

innocent explanation for the blood stains which were found on Mr. House's blue jeans,

*i.e.*, that those stains originated during the mishandling of the sample tubes of blood

taken during Ms. Muncey's autopsy.  *House v. Bell* at 2079-83. While trial counsel had

not, for reasons discussed *infra*, presented that explanation to Mr. House's jury, he did

specifically argue that there was a question raised by the fact that the stains on Mr.

House's blue jeans had more active enzymes than the blood sample taken during Ms.

Muncey's autopsy (R. 4, T.T.  p. 1271), and challenged the prosecution's failure to test

Ms. Muncey's clothing to determine whether blood on items of clothing (which most

certainly were stained during the course of the murder) showed the same active

{9}

enzymes as the stains on Mr. House's blue jeans. (*Id.*). Furthermore, trial counsel testified under oath before this Court that he would have also used this evidence to argue that, if the presence of blood stains on House's jeans showed he was present at the murder, the absence of blood stains on his shoes demonstrated that he was not present. The State's failure to reveal the report showing that no blood was found upon Mr. House's tennis shoes violated *Brady* and its argument that the blood stain evidence undermined by this report evidence was reliable violated *Giglio* and *Napue*.

> **4.** **Law enforcement reports and records indicating that blood samples from Ms. Muncey's autopsy, Mr. House's blue jeans, and other physical evidence were, at a minimum, mishandled during transportation from Union County, Tennessee, to the FBI Crime Laboratory.**

During Mr. House's *Schlup* hearing, Mr. House presented substantial evidence that the physical evidence which formed the very heart of the State's case was, if not deliberately manipulated, mishandled. Much of that evidence consists of law enforcement reports and records, as well as matters solely within the knowledge of various state actors. This evidence includes:

• evidence that the label on the Styrofoam container originally contained Ms. Muncey's four blood samples and vaginal secretions (R. 276, Paul Bigbee, Hearing Transcript, v.III; p. 154).

• evidence that the vaginal secretions were not received by the FBI in the Styrofoam box in which they were packaged with the blood, but in a manila envelope (R. 276, Paul Bigbee, Hearing Transcript, v.III; p. 156; Plaintiff's Hearing Exhibit 22, 33-8, and 33-9);

• evidence that no more than one-quarter of one tube of the blood taken during Ms. Muncey's autopsy was used for testing purposes (R. 276, Paul Bigbee, Hearing Transcript, v.III; p. 154);

{10}

• evidence that no blood was spilt from the sample tubes during the testing procedure at the FBI Crime Laboratory (R. 276, Paul Bigbee, Hearing Transcript, v.III; p. 136);

• evidence that no blood spilt from the sample tubes from the time they left the FBI Crime Laboratory until they reached the defense serological expert, <u>except for blood spilt wholly within the Styrofoam box and therefore unobservable to the person transporting those samples.</u> (R. 123, Attachment 1);

• evidence that law enforcement failed to follow accepted practices for the handling of forensic evidence creating the possibility of cross-contamination. (R. 276, Paul Bigbee, Hearing Transcript, v.III; p. 157-158; Plaintiff's Hearing Exhibit 33-5)

The State's knowledge of disarray of the physical evidence submitted to the FBI Crime Laboratory should have been disclosed under *Brady v. Maryland*. Its presentation of argument and testimony regarding the chain of custody and the reliability of the blood evidence was false and misleading and violated *Napue v. Illinois*. The Supreme Court of the United States observed that the evidentiary disarray surrounding the handling of the physical evidence submitted to the FBI Crime Laboratory contributed to rendering the State's blood stain evidence so unreliable that no reasonable juror in the entire country would rely upon that evidence to convict Mr. House. *House* at 2083. In discussing this disarray, the Court specifically noted much of the afore-described undisclosed evidence was material to this conclusion: *Id* at 2081 (removal of the vaginal secretions); *id*. at 2083 (missing blood); *id*, at 2081 (cross contamination of evidence).

This evidence was wholly within the control of the State of Tennessee and/or its agents. Only the FBI Crime Laboratory, and law enforcement officers Breeding and Munsey, knew that Ms. Muncey's vaginal secretions did not arrive in the Styrofoam box in which they, together with the blood samples were originally packaged. Only the FBI

Crime Laboratory, and law enforcement officers Breeding and Munsey, knew that the State of Tennessee had improperly packaged, and thereby cross-contaminated, critical portions of the physical evidence submitted to the FBI Crime Laboratory. Moreover, Agent Bigbee admitted under cross-examination that not only did he not return improperly labeled and/or cross-contaminated evidence without testing (as he claimed was FBI policy), he made no notation in his records that these events had occurred. *Id*. at 2081. The State's failure to reveal the evidence of the disarray surrounding the blood stains violated *Brady* and its argument that the evidence was reliable violated *Giglio* and *Napue*. Because prejudice has been established, relief is warranted.

> **5.** **The false and misleading testimony of FBI Special Agent Chester Blythe.**

Astoundingly, the record reveals that the State of Tennessee presented even more false and misleading evidence than that specifically mentioned by the United States Supreme Court. At trial, the State of Tennessee offered the testimony of FBI Agent Chester Blythe that he located blue jeans fibers on every item of Ms. Muncey's clothing that were "consistent in every way that you could examine them" with fibers taken from the cotton blue jeans Mr. House was wearing on the night of the murder to demonstrate Mr. House's guilt. (R. 4, T.T. p. 864-65) Recognizing the impact of this evidence upon the jury, an impact not missed by the Tennessee Supreme Court, *see State v. House*, 743 S.W.2d 141, 143 (Tenn. 1987), trial counsel attempted to counter Agent Blythe's testimony during cross-examination by obtaining his admissions that the fibers were very common, that there were no fibers from Ms. Muncey's clothing found on Mr. House's blue jeans (R. 4, T.T. p. 867), and that cotton clothing both readily transfers fibers, and retains transferred fibers (*Id*.). Trial counsel then specifically asked Agent

{12}

Blythe about the transference of fibers from Ms. Muncey's clothing back to Mr. House's blue jeans:

Q.    Did you check the blue jeans to see if there was any textile fiber transfer from any of the victim's garments, Mrs. Muncey, on to these jeans?
A.    Yes and no.  Saying that her nightgown was not the type of material that would transfer.
Q.    What is the type of material that does transfer?
A.    Well, things that are tightly woven, and especially things made of nylon, don't tend to transfer at all.
Q.    How about cotton?
A.    Cotton garments like blue jeans or a wool garment, like a sweater, those things tend to transfer readily, they tend to hold fibers that are transferred well also.
Q.    My question is, did you find any material consistent with Mrs. Muncey's garments on the blue jeans of Mr. House?
A.    No sir, I didn't.
Q.    All right.  And you looked for that, didn't you?
A.    Yes sir, I did.
Q.    That would be important, wouldn't it, because that would give you some indication as to whether or not these garments had in fact had some contact?
A.    It would be indicative of the content, yes.

(R. 4, T.T. p. 867-868)

What Agent Blythe did not say, and what his handwritten notes established, was that Ms. Muncey's housecoat, bra, and panties were all made of cotton (Trial exhibit 32).  Agent Blythe's deceptive response to trial counsel's direct question was a patent attempt to conceal these exculpatory facts from Mr. House's jury.  Yes, extremely common blue jean fibers were found on Ms. Muncey's clothing, fibers which were so common they could have even come from the jeans worn by three or four of the jurors (*Id.* at 869), but what Agent Blythe hid from Mr. House's jury was the fact that <u>not a single easily transferable cotton fiber from Carolyn Muncey's housecoat, bra, or panties was found on the "fiber retaining" cotton blue jeans Mr. House was wearing on the night of the murder</u>.  Agent Blythe deceived the Tennessee Supreme Court, and undoubtedly Mr. House' jury, into believing that the fiber evidence showed Mr. House's guilt when, in reality, in <u>truth</u>, it was yet more proof of his innocence.

{13}

The State of Tennessee's presentation of the false and misleading testimony of FBI Agent Chester Blythe violated the Constitution of the United States and the United States Supreme Court's decision in *Giglio v. United States*, 450 U.S. 150 (1972). It has long been established that the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Banks v. Dretke*, 540 U.S. 688, 694 (2004), *citing, Giglio v. United States*, 450 U.S. 150, 153 (1972). The testimony of Agent Blythe was nothing less than such a deliberate deception. In response to a direct question about the transfer of fibers from Ms. Muncey's clothing, Agent Blythe, at the same time he was emphasizing that cotton fabrics both shed and retain fibers readily, told Mr. House's jury that he was not surprised that no fibers from Ms. Muncey's clothing were found on Mr. House's cotton blue jeans because her nightgown was not the type of material that would transfer. As he spoke, Agent Blythe knew that every other item of clothing worn by Ms. Muncey was, in fact, cotton but repeatedly tried to explain away the absence of a two-way transfer by pointing to the nature of the fabric used in Ms. Muncey's clothing. His testimony was false. The state court's reliance on that testimony appeared on the face of the Tennessee Supreme Court's opinion in Mr. House's case. The United States Supreme Court determined that prejudice had been established even without taking this additional false testimony into account. The State's failure to reveal the exculpatory evidence in Agent Blythe's report violated *Brady* and its presentation of Agent Blythe's false and misleading testimony violated *Giglio* and *Napue*. Relief is warranted.

      **C.**    **The record reveals that trial counsel rendered deficient performance by failing to properly investigate Mr. House's case for innocence and/or failing to properly challenge the State's case for guilt.**

            **1.**    **If the State of Tennessee revealed Agent Scott's interview of Hubert Muncey, Jr., trial counsel was ineffective in failing to investigate evidence of Mr. House's innocence.**

{14}

Anticipating Respondent's attempt to excuse the State of Tennessee's failure to disclose Agent Scott's report by asserting that the State of Tennessee maintained some sort of "open file" policy <u>and</u> that, had trial counsel merely bothered to review the prosecutor's file, trial counsel would have discovered the report, Mr. House points out that, even if Respondent's factual assertion were correct, Mr. House would nonetheless be entitled to relief. Effective counsel would have followed up on the information about Mr. Muncey's description of the last time he had engaged in sexual intercourse with his wife. Indeed, Mr. Burks testified that he, in fact, would have done exactly that. If this report was turned over, or even if it was discoverable by trial counsel through the exercise of due diligence, and counsel failed to present this evidence to Mr. House's jury, then counsel's performance fell below that required in *Strickland*. Because prejudice has been established, relief is warranted.

> **2.** **<u>If</u> the State of Tennessee revealed the Agent Presnell's interview of Kathy Parker, trial counsel was ineffective in failing to investigate evidence of Mr. House's innocence.**

Anticipating Respondent's attempt to excuse the State of Tennessee's failure to disclose Agent Presnell's report showing that Kathy Parker possessed information relevant to Mr. House's defense by asserting that the State of Tennessee maintained some sort of "open file" policy <u>and</u> that, had trial counsel merely bothered to review the prosecutor's file, trial counsel would have discovered the report, Mr. House points out that, even if Respondent's factual assertion were correct, Mr. House would nonetheless be entitled to relief. Effective counsel would have followed up on the information about Ms. Parker. Indeed, Mr. Burks testified that he, in fact, would have done exactly that. If this report was turned over, or even if it was discoverable by trial counsel through the exercise of due diligence, and counsel failed to present this evidence to Mr. House's jury, then counsel's performance fell below that required in *Strickland*. Because prejudice has been established, relief is warranted.

{15}

     **3.**       **If the TBI report regarding the examination of Mr. House's tennis shoes was disclosed, trial counsel was ineffective in failing to investigate evidence of Mr. House's innocence.**

Anticipating Respondent's attempt to excuse the State of Tennessee's failure to disclose the Tennessee Bureau of Investigation report on its examination of Mr. House's tennis shoes by asserting that the State of Tennessee maintained some sort of "open file" policy <u>and</u> that, had trial counsel merely bothered to review the prosecutor's file, trial counsel would have discovered the report, Mr. House points out that, even if Respondent's factual assertion were correct, Mr. House would nonetheless be entitled to relief. Effective counsel would have shown the jury that the shoes Mr. House was wearing on the night of the murder, the shoes that would have been within a fraction of an inch from the where blood was wiped or dropped on Mr. House's jeans (if indeed that transfer occurred during Carolyn Muncey's murder as the prosecution claimed), had no blood on them whatsoever. Indeed, Mr. Burks testified that he, in fact, would have done exactly that. If this report was turned over, or even if it was discoverable by trial counsel through the exercise of due diligence, and counsel failed to present this evidence to Mr. House's jury, then counsel's performance fell below that required in *Strickland*. Because prejudice has been established, relief is warranted.

     **4.**       <u>If</u> **evidence of the disarray surrounding the handling and chain of custody of the blood evidence in Mr. House's case would have been discovered by effective counsel, trial counsel was ineffective in failing to investigate evidence of Mr. House's innocence.**

Anticipating Respondent's attempt to excuse the State of Tennessee's failure to disclose the evidentiary disarray tainting the evidence of blood stains on Mr. House's blue jeans by asserting that there was other evidence was available to trial counsel which would have led competent counsel to discover the evidence which it had failed to disclose, Mr. House points out that, even if Respondent's factual assertion were correct, Mr. House would nonetheless be entitled to relief. While it is true that the serological expert retained by House's trial counsel

Case 3:96-cv-00883   Document 335   Filed 07/19/07   Page 16 of 23   PageID #: <pageID>

possessed a photograph showing that the blood in one of the four tubes of the victim's blood which were transported to the FBI Crime Laboratory together with Mr. House's blue jeans was missing (Petitioner's exhibit 8), it is sheer speculation that even effective counsel would have been alerted to the undisclosed evidence described above, and, consequently, that this blood had "escaped" the sample tube prior to FBI testing. Allowing Respondent every inference, and therefore assuming that competent counsel would have indeed been alerted to this possibility, investigated the same, and that Agent Bigbee and/or officers Breeding and Munsey would have revealed the foregoing evidence, counsel's failure to conduct such an investigation and present this evidence to Mr. House's jury, would fall below the standard required in *Strickland*. Because prejudice has been established, relief is warranted.

5.    **Trial counsel failed to investigate Hubert Muncey's Jr.'s long history of spousal abuse, his false statements regarding his activities on the night of the murder , and his suspicious activities on the day following the murder.**

As the Supreme Court of the United States observed, there were a number of witnesses who, had they been called at trial, could have provided additional support to trial counsel's theory that Mr. Muncey was the actual perpetrator of the murder of Carolyn Muncey and could have buttressed the testimony of Ricky Green, Carolyn Muncey's brother,  whose testimony was attacked by the prosecution on cross-examination and in closing argument after he stated at trial that Mr. Muncey was a chronic abuser had so terrified his wife that she had made plans to take their children and leave him. *House v. Bell* at 2083. They included:

•    Dennis Wallace, the local constable who could have testified that Mr. Muncey was known in the community to be a severe alcoholic who was abusive to his wife and that Mr. Muncey had left the dance between 9:30 and 10:30 P.M. and did not return, <u>even though Muncey claimed to have stayed at the dance until it ended after midnight</u>. (R. 274, pp.56-57, 73-74)

{17}

• Mary Atkins, a friend of Mr. Muncey, who not only had seen bruising from prior abuse, but had seen Mr. Muncey strike his wife on the night she was murdered <u>even though Mr. Muncey claimed that he had not seen his wife since early that morning</u>. (R. 274, pp.13, 15-16)

• Hazel Miller, a friend of Mr. Muncey, who could have testified that a few months before her murder Mr. Muncey stated that he had been in an argument with his wife and was going to get rid of her "one way or the other." (R. 274, p.48)

• Artie Lawson, a friend of Mr. Muncey, who could have testified that Mr. Muncey had tried to arrange a false alibi for his whereabouts the entire previous evening. (R. 274, p. 22 and 24)

Notwithstanding the fact that trial counsel's theory of defense centered around Hubert Muncey Jr. being the actual perpetrator, none of these witnesses were interviewed and none testified at trial. All were located easily enough by habeas counsel and testified before this Court, even after the passage of over a decade. Trial counsel's failure to locate and present these witnesses constituted deficient performance under *Strickland*. Because prejudice has been established, relief is warranted.

> **6. Trial counsel failed to present evidence that similarities in blood degradation in sample tubes of blood taken during Ms. Muncey's autopsy and blood stains found on Mr. House's blue jeans were consistent with the sample tubes being the source of the stains.**

Dr. Cleland Blake, the Assistant Chief Medical Examiner for the State of Tennessee, testified that the bloodstains on Mr. House's blue jeans came from blood contained in the sample tubes taken during Carolyn Muncey's autopsy, *not* from transmission during the crime. (R. 275, H.T. Vol. II, p. 110 Blake testimony). He explained the basis for his finding as follows: He observed that when Agent Bigbee tested Ms. Muncey's autopsy samples in 1985, Bigbee detected measurable enzymatic activity for only a small number of sixteen factors. Again when Agent Bigbee tested the bloodstains on Mr. House's blue jeans, he was able to detect measurable activity

{18}

for only the same small number. (R. 275, H.T. Vol. II, p. 113 Blake testimony). Consistent with Agent Bigbee's trial testimony, Dr. Blake opined that certain factors/enzymes in human blood varied in stability, and noted that one, the glyoxylase enzyme, should have been present in the bloodstains on Mr. House's blue jeans. (R. 275, H.T. Vol. II, p. 115-16 Blake testimony). Dr. Blake also agreed with Bigbee that many factors contributed to a finding of no measurable activity, including whether the blood sample was liquid or a dried stain, the environmental factors to which the blood had been exposed, and the amount of bacterial activity. (R. 274, H.T. Vol. I, p. 79-80, 92, Vol. II, p. 110, 112 Blake testimony). Finally, Dr. Blake considered evidence that blood appeared to have escaped the autopsy blood samples prior to their arrival at the FBI crime laboratory. (R. 275, H.T. Vol. II, p. 93-94 Blake testimony).

Because the Carolyn Muncey autopsy sample was "rotted" liquid blood, removed from a body that had lain out in ninety-degree weather for the better part of a day, while the stains on House's blue jeans had been subjected to much different environmental factors, it could be expected that the enzyme factors on each would differ significantly. Because both showed measurable activity for virtually the same enzymes, Dr. Blake concluded that the source of the bloodstains on Mr. House's jeans was the highly degraded liquid blood samples taken during her autopsy. (R. 275, H.T. Vol. II, p. 110. 113 Blake testimony).

Agent Bigbee was called to rebut Dr. Blake's opinion, but agreed with Blake that liquid blood would degrade faster than dried blood, (R. 275, H.T. Vol. II p. 166 Bigbee testimony). He also agreed that the blood in Ms. Muncey's sample tubes was badly degraded, *id.*, and that one of the missing enzymes, glyoxylase, would normally exhibit detectable activity a week after death, *id.,*(H.T. Vol. II, p.166-67 Bigbee testimony). He even agreed that it was "curious" that the bloodstains on the jeans and the autopsy samples showed such similarity in the enzymes that displayed similar identifiable activity. Agent Bigbee opined, however, that because there were many different factors that could cause a particular enzyme to not demonstrate identifiable activity,

{19}

the bloodstains on Mr. House's jeans could have been exposed to a different set of factors than the liquid autopsy samples and still have yielded such similar results when tested. Not surprisingly, Agent Bigbee never testified that Dr. Blake's opinion was not at least a possible explanation for the blood stains on Mr. House's jeans.

Trial counsel was ineffective for failing to effectively cross-examine Agent Bigbee regarding the similarities in enzymatic degradation, failing to retain their own expert to testify on the same subject, and failing to argue that the sample tubes of Ms. Muncey's blood were the source of the blood stains found on Mr. House's blue jeans. According to the hearing testimony of Dr. Cleland Blake, the principles upon which he relied in reaching his conclusions were not recently discovered, but were, in fact, the very same principles espoused by state expert Special Agent Paul Bigbee at the time of trial. *Compare* R. 4, Paul Bigbee, Trial Transcript, volume III; pp. 166-167; volume IV, pp.574-575, with R. 275, Dr. Cleland Blake, Hearing Transcript, v.II; p. 112. Indeed, Dr. Blake testified that he himself was a forensic pathologist at the time of Mr. House's trial (R. 275, Dr. Cleland Blake, Hearing Transcript, v.II; pp. 15-16), therefore the very same witness presented by Mr. House during these proceedings was available to trial counsel at the time of trial. In addition, it must be noted that Agent Bigbee admitted during these proceedings that the pattern of blood degradation observed by Dr. Blake could have been significant (R. 276, Paul Bigbee, Hearing Transcript, v.III; pp. 168-170). This concession, which the United States Supreme Court found significant to Mr. House's assertion of innocence, could just as easily have been obtained by trial counsel.

Because prejudice has been established, relief is warranted.

> **7.** **<u>If</u> Agent Blythe's report on his examination of the fiber evidence in Mr. House's case was disclosed, trial counsel was ineffective in failing to investigate evidence of Mr. House's innocence and/or to effectively cross-examine Agent Blythe.**

Anticipating that the State will argue that Agent Blythe was free to mislead the jury because

{20}

trial counsel was in possession of the FBI Crime Laboratory file (including Agent Blythe's handwritten notes), should have known of Agent Blythe's dishonesty, and therefore could have brought it to the attention of the jury, Mr. House is still entitled to relief.

First, the argument itself is unsound. As the United States Supreme Court stated in *Banks*,

The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence," Tr. of Oral Arg. 35, so long as the "potential existence" of a prosecutorial misconduct claim might have been detected, *id.,* at 36. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.

*Banks v. Dretke*, 540 U.S. at 696. Even if the argument were sound, trial counsel's failure to point out Agent Blythe's dissembling of this significant evidence to Mr. House's jury would fall below the standard required in *Strickland*. The American Bar Association guidelines require counsel to independently investigate forensic evidence. ABA Guidelines No. 10.7, Commentary, Guilt/Innocence, No. 4. Because the blood evidence was relied upon by the prosecutor to connect House to the crime scene, counsel had a duty to investigate it. Failure to do so constitutes deficient performance. Because prejudice is established *a fortiori* by the Supreme Court's finding of actual innocence, relief is warranted.

### III.    Conclusion

Over twenty years have passed since the State of Tennessee obtained Mr. House's conviction and sentence at the expense of the Constitution of the United States. No material issue of fact appears within the bounds of the record before this Court and no evidentiary hearing is required. The Supreme Court of the United States has found that the evidence which the record demonstrates was undisclosed by the State of Tennessee and/or available to diligent counsel meets the actual innocence standard. The actual innocence standard is far higher than that required to establish that Mr. House was prejudiced by these constitutional violations, that of actual

{21}

innocence.  Now more than thirteen full months after the Supreme Court of the United States held that no reasonable juror in the entire United States would convict Mr. House of the murder of Carolyn Muncey, the State of Tennessee has done nothing to correct the manifest injustice of his continued incarceration.  Meanwhile, Mr. House's health continues to decline.  Relief should be granted without delay.

WHEREFORE, Petitioner respectfully requests that this Court enter an order summarily issuing a conditional writ of habeas corpus to the Respondent directing him to release the Petitioner from his illegal conviction and sentence of death unless the State of Tennessee within ninety days vacates both Petitioner's conviction and sentence and afford Petitioner the fair trial to which he, and all other persons in this country are entitled.  Further, Petitioner requests that this Court find all other issues mooted by the issuance of the writ.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

/s/Stephen M. Kissinger
Stephen M. Kissinger
Asst. Federal Community Defender
530 S. Gay Street, Suite 900
Knoxville, TN  37902
(865) 637-7979

{22}

CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2007, the foregoing Amended Complaint was filed electronically. Notice electronically mailed by the Court's electronic filing system to all parties indicated on the electronic filing receipt. Notice delivered by other means to all other parties via regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/Stephen M .Kissinger

{23}