UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| PAUL GREGORY HOUSE, | ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:96-cv-883 |
| | ) | *Mattice/Carter* |
| RICKY BELL, Warden, | ) ) | |
| Respondent. | ) | |

**MEMORANDUM**

This is a petition for the writ of habeas corpus under 28 U.S.C. § 2254; the petitioner is presently incarcerated on death row. The matter is before the court on the petitioner's amendment to the amended petition, petitioner's motion for summary judgment, and the respondent's response to the amendment and response to the motion for summary judgment.

For the following reasons, the motion for summary judgment [Court Doc. 307] will be **GRANTED IN PART** and **DENIED IN PART**. Petitioner will be **GRANTED** a conditional writ of habeas corpus that will result in the vacation of his conviction and sentence unless the State of Tennessee commences a new trial against him within 180 days after this judgment becomes final.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted of the first degree murder of Mrs. Carolyn Muncey and was sentenced to death. His conviction and sentence were affirmed on direct appeal. *State v. House*, 743 S.W.2d 141 (Tenn. 1987). House was twice denied state post-conviction relief. *House v. State*, C.C.A. No. 28, 1989 WL 152742 (Tenn. Crim. App. Dec. 15, 1989), *perm. app. denied, id.* (Tenn. March 5, 1990), *cert. denied*, 498 U.S. 912 (1990); *House v. State*, 911 S.W.2d 705 (Tenn. 1995), *cert. denied*, 517 U.S. 1193 (1996).

Petitioner then filed his petition for the writ of habeas corpus. This court[1] granted summary judgment as to all claims other than petitioner's claim of actual innocence and the claims associated with the actual innocence claim. The basis for summary judgment was that almost half of the claims were procedurally defaulted; the court rejected the remaining claims on the merits. *House v. Bell*, Civil Action No. 3:96cv883 (E.D. Tenn. June 25, 1998) (order and memorandum opinion granting partial summary judgment). After an evidentiary hearing on the claim of actual innocence, the court concluded that petitioner had failed to demonstrate actual innocence and denied the habeas corpus petition. *Id.* (E.D. Tenn. February 16, 2000) (order and memorandum opinion denying habeas corpus petition).

After granting en banc review, the Sixth Circuit affirmed the denial of habeas corpus relief. *House v. Bell*, 386 F.3d 668 (6th Cir. 2004) (en banc).

---

[1] The case was originally assigned to the Honorable James H. Jarvis. The case was reassigned on May 15, 2007 to the undersigned, due to the declining health of Judge Jarvis. [Court Doc. 325]. Judge Jarvis passed away on June 6, 2007.

The United States Supreme Court reversed and remanded. *House v. Bell*, 126 S. Ct. 2064 (2006). The Supreme Court found that petitioner satisfied the gateway standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995), "for obtaining federal review despite a state procedural default." 126 S. Ct. at 2087. The *Schlup* standard requires "that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Id.* at 2076-77 (quoting *Schlup*, 513 U.S. at 327).

The Supreme Court further observed that "a petition supported by a convincing *Schlup* gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error.'" *Id.* at 2077 (quoting *Schlup*, 513 U.S. at 317).

The result of the Supreme Court's decision is that this court must consider on the merits the claims that were procedurally defaulted. "House has satisfied the gateway standard set forth in *Schlup* and may proceed on remand with procedurally defaulted constitutional claims." *Id.* at 2087. After the case was remanded to this court, petitioner filed a motion for summary judgment on seven of his claims for relief. Because several of those claims were based upon evidence that was developed at the evidentiary hearing on the actual innocence claim, petitioner was allowed to amend his habeas corpus petition to conform to the proof. Respondent has now filed his response to the amended petition and his response to the motion for summary judgment.

## II. PETITIONER'S CLAIMS FOR RELIEF

As noted, petitioner filed a motion for summary judgment on seven of his claims for relief. Those claims, as listed in petitioner's index of claims, are as follows:

39. *Prosecutorial Misconduct -- Intentional Withholding of Evidence -- Blue Jeans*

This claim relates to the State's delay in turning over petitioner's blue jeans to defense counsel for expert testing of the bloodstains. By the time petitioner's expert received the blue jeans, the bloodstains had deteriorated to such an extent that the expert was unable to do any meaningful testing. Petitioner moved to suppress the bloodstain evidence based upon the State's delay; the trial court denied the motion to suppress and the Tennessee Supreme Court affirmed. This court denied the claim on the merits, holding that the state courts' finding of no deliberate delay on the part of the State was presumed correct and that the state courts' determination that the evidence should not have been suppressed was not an unreasonable application of clearly established federal law.

40. *Prosecutorial Misconduct -- Intentional Withholding of Evidence -- Blue Jeans -- Interference with Constitutional Right to Effective Assistance of Counsel*

This claim was held procedurally defaulted based upon petitioner's failure to raise the claim in any state court proceeding.

41. *Prosecutorial Misconduct -- Introduction of Tampered or False Evidence*

In his original amended habeas corpus petition, petitioner alleged that the physical evidence used to convict him showed significant signs of tampering. He specifically claimed that the underpants taken from Mrs. Muncey showed no traces of semen at the time of their initial testing, pursuant to the orders of Dr. Carabia, the county medical examiner, but that semen was determined to be present when the underpants were tested by the FBI lab. The claim was procedurally defaulted based upon petitioner's failure to raise the claim in any state court proceeding.

Petitioner has apparently abandoned this claim with respect to Mrs. Muncey's underpants and now relies on evidence developed at the evidentiary hearing. He specifically alleges that FBI Special Agent Chester Blythe misled the jury with respect to the transfer of fibers from Mrs. Muncey's clothes to petitioner and vice versa. Agent Blythe testified that the blue jean fibers found on Mrs. Muncey's clothing were consistent with fibers from petitioner's blue jeans. On cross examination, Agent Blythe admitted that blue jean fibers were very common, that no fibers from Mrs. Muncey's clothing were found on the blue jeans, and that cotton clothing easily transfers and retains fibers.

When asked whether fibers from Mrs. Muncey's clothing were found on petitioner's blue jeans, Agent Blythe answered no but also opined that clothing made of nylon doesn't transfer at all and that Mrs. Muncey's nightgown was not the type of material that would transfer. Agent Blythe did not reveal that Mrs. Muncey's housecoat, bra, and panties were all made of cotton. Petitioner argues that Agent Blythe's deceptive response was an attempt to conceal exculpatory facts from the jury.

42.  *Prosecutorial Misconduct -- Intentional Withholding of Exculpatory Evidence*

In his original amended habeas corpus petition, petitioner alleged that the prosecution withheld evidence of the FBI's final report on items tested at its lab in Washington, D.C. That was a conclusory claim, not supported by a factual basis, and it was procedurally defaulted based upon petitioner's failure to raise the claim in any state court proceeding.

Petitioner has apparently abandoned this claim and now relies on evidence developed at the evidentiary hearing. He specifically claims the prosecution withheld the following evidence: the law enforcement report indicating that Mr. Muncey had sex with his wife the morning of her death,[2] Kathy Parker's statement regarding Mr. Muncey telling some men he did not care about his wife and they could have her,[3] the fact that no blood was found on petitioner's shoes,[4] and the mishandling of the blood and other physical evidence.[5]

---

[2] Mr. Muncey was interviewed by TBI Special Agent Charles Scott on November 25, 1985 and informed Agent Scott that he had sex with his wife the morning of her death. Agent Scott reduced the interview to a memorandum which, according to petitioner, was provided to the prosecution but not to defense counsel.

[3] Ms. Parker was interviewed by TBI Special Agent Ray Presnell on July 15, 1985, and stated that her brother heard Mr. Muncey tell some men from Washburn, Tennessee that Mrs. Muncey was home and the men could go get her if they wanted because he did not care anymore. Agent Presnell reduced the interview to a memorandum which, according to petitioner, was provided to the prosecution but not to defense counsel.

[4] After petitioner was arrested, law enforcement located the tennis shoes he was wearing on the night of the murder and submitted them for testing for human blood. The TBI issued a report on January 30, 1986 indicating that no trace of blood was found on the tennis shoes. Defense counsel, according to petitioner, did not receive a copy of the report.

[5] This claim relates to petitioner's allegation that blood was spilled within the styrofoam box used to transport it for forensic testing and leaked onto his jeans.

55. *Ineffective Assistance of Trial Counsel -- Failure to Adequately Investigate Guilt/Innocence*

In his original amended habeas corpus petition, petitioner alleged numerous instances of ineffective assistance of counsel with respect to counsel's failure to investigate petitioner's guilt or innocence. Although the claim was procedurally defaulted, it was considered as part of the evidentiary hearing on petitioner's claim of actual innocence. Petitioner specifically claims now that counsel should have discovered the following: the law enforcement report indicating that Mr. Muncey had sex with his wife the morning of her death, Kathy Parker's statement regarding Mr. Muncey telling some men he did not care about his wife and they could have her, the fact that no blood was found on petitioner's shoes, the mishandling of the blood and other physical evidence, and Mr. Muncey's history of spousal abuse and his suspicious behavior the day after the murder. Petitioner also claims counsel failed to present evidence of similarities in blood degradation in the sample tubes of Mrs. Muncey's blood and the blood stains on petitioner's blue jeans, and failed to effectively cross-examine Agent Blythe with respect to the transfer of fibers.

57. *Ineffective Assistance of Trial Counsel -- Failure to Call All Available Witnesses that would have Benefitted the Defense in this Case*

In his original amended habeas corpus petition, petitioner alleged that counsel should have called Mr. Muncey as a witness, in addition to other unnamed material witnesses. Although the claim was also procedurally defaulted, it was considered as part of the evidentiary hearing on petitioner's claim of actual innocence. Petitioner specifically

claims now that counsel should also have discovered and interviewed Dennis Wallace, Mary Atkins, Artie Lawson and Hazel Miller, all of whom were witnesses to Mr. Muncey's spousal abuse as well as his activities the evening of the murder.

> 58.  *Ineffective Assistance of Trial Counsel -- Failure to Discover Tampered or False Evidence*

In his original amended habeas corpus petition, this allegation referred to counsel's failure to discover the alleged tampering with the semen evidence on Mrs. Muncey's underpants (see claim 41, *supra*).  The claim was procedurally defaulted based upon petitioner's failure to raise the claim in any state court proceeding.  As noted in the discussion on claim 41, this allegation now concerns counsel's failure to discover that FBI Agent Blythe misled the jury with respect to the transfer of fibers from Mrs. Muncey's clothes to petitioner and vice versa.

## III.  DISCUSSION

In describing the *Schlup* inquiry, the Supreme Court observed that "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'"  126 S. Ct. at 2077 (quoting *Schlup*, 513 U.S. at 327-28) (internal quotations omitted).  "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'  The court's function is not to make an independent factual determination about what likely occurred, but rather to

assess the likely impact of the evidence on reasonable jurors." *Id.* (quoting *Schlup*, 513 U.S. at 329).

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt — or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*Id.*

The Court then considered the evidence developed in petitioner's habeas corpus evidentiary hearing, beginning with the recent DNA evidence in the case. "First, in direct contradiction of evidence presented at trial, DNA testing has established that the semen on Mrs. Muncey's nightgown and panties came from her husband, Mr. Muncey, not from House." *Id.* at 2078-79.

The Court next considered the bloodstains on petitioner's blue jeans, along with the alleged spillage of blood samples in the styrofoam box.

> In sum, considering "all the evidence" on this issue, we think the evidentiary disarray surrounding the blood, taken together with Dr. Blake's testimony and the limited rebuttal of it in the present record, would prevent reasonable jurors from placing significant reliance on the blood evidence. We now know, though the trial jury did not, that an Assistant Chief Medical Examiner believes the blood on House's jeans must have come from autopsy samples; that a vial and a quarter of autopsy blood is unaccounted for; that the blood was transported to the FBI together with the pants in conditions that could have caused vials to spill; that the blood did indeed spill at least once during its journey from Tennessee authorities through FBI hands to a defense expert; that the pants were stored in a plastic bag bearing both a large blood stain and a label with TBI Agent Scott's name; and that the styrofoam box containing the blood samples may well have been opened before it arrived at the FBI lab. Thus, whereas the bloodstains, emphasized by the prosecution, seemed strong evidence of House's guilt at trial, the record now raises substantial questions about the blood's origin.

*Id.* at 2083 (quoting *Schlup* at 328) (internal quotations omitted).

Finally, the Court considered the possibility that Mr. Muncey was the person who killed Mrs. Muncey. "There is, however, more; for in the post-trial proceedings House presented troubling evidence that Mr. Muncey, the victim's husband, himself could have been the murderer." *Id*. The Court first observed that the jury heard testimony from Mrs. Muncey's brother that Ms. Muncey was afraid of her husband and wanted to leave him, and that Mr. Muncey had been seen striking his wife. *Id*. The Court then noted that "House now has produced evidence from multiple sources suggesting that Mr. Muncey regularly abused his wife." *Id*. The Court specifically referred to Kathy Parker's testimony that Mrs. Muncey constantly displayed signs of abuse; Hazel Miller's testimony that Mr. Muncey told her was going to get rid of his wife; Mary Atkins' testimony that she saw Mr. Muncey strike Mrs. Muncey during an argument on the night of the murder; and Artie Lawson's testimony that, on the morning after Mrs. Muncey's disappearance, Mr. Muncey asked her to provide an alibi for him for the night before. *Id*. at 2083-84.

Of particular importance to the Supreme Court on this issue was the testimony of Kathy Parker and Penny Letner that Mr. Muncey confessed to killing his wife. *Id*. at 2084.

> In the habeas proceedings, then, two different witnesses (Parker and Letner) described a confession by Mr. Muncey; two more (Atkins and Lawson) described suspicious behavior (a fight and an attempt to construct a false alibi) around the time of the crime; and still other witnesses described a history of abuse.

*Id*. at 2085. The Court also commented on testimony from Dennis Wallace that suggested Mr. Muncey had the opportunity to kill his wife. *Id*. at 2084-85. Mr. Wallace was a local law enforcement official providing security at the dance on the night of the murder; he saw Mr. Muncey leave the dance early but did not recall seeing him return. *Id*. at 2084.

In conclusion, the Court noted that "the central forensic proof connecting House to the crime — the blood and the semen — has been called into question, and House has put forward substantial evidence pointing to a different suspect." *Id.* at 2086. The Court then determined that "House has satisfied the gateway standard set forth in *Schlup*... ." *Id.* at 2087. "[T]his is the rare case where — had the jury heard all the conflicting testimony — it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* at 2086.[6]

The Federal Rules of Civil Procedure apply to habeas corpus petitions. Rule 11 of the Rules Governing Section 2254 Cases In The United States District Courts. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986); *Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985). The

---

[6]The Supreme Court would not go so far as to order petitioner's release, however, noting that, because some aspects of the State's evidence supported an inference of guilt, "[t]his is not a case of conclusive exoneration." *Id.* at 2086. The Court thus held that, although petitioner "cast considerable doubt on his guilt," he did not satisfy the "'extraordinarily high'" threshold for a freestanding innocence claim. *Id.* at 2087 (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)).

burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).

Because this court must consider petitioner's defaulted claims on the merits, the case is ripe for consideration on petitioner's motion for summary judgment.

This court granted the State summary judgment on claim 39, which alleged that the State withheld the blue jean evidence. Accordingly, petitioner is not entitled to summary judgment on that claim. Similarly, petitioner is not entitled to summary judgment on claim 40, which alleged that the withholding of the blue jean evidence interfered with petitioner's right to counsel. Although that claim was procedurally defaulted, this court having found that the record supported the state courts' finding of no deliberate delay on the part of the State, the State would have been entitled to summary judgment on the claim, and thus petitioner is not entitled to summary judgment on the claim.

In claim 41, petitioner alleges the introduction of false evidence, with specific reference to the testimony of FBI Special Agent Chester Blythe. The Supreme Court summarized Agent Blythe's testimony as follows:

> A different FBI expert, Special Agent Chester Blythe, testified about fiber analysis performed on Mrs. Muncey's clothes and on House's pants. Although Agent Blythe found blue jean fibers on Mrs. Muncey's nightgown, brassier, housecoat, and panties, and in fingernail scrapings taken from her body (scrapings that also contained trace, unidentifiable amounts of blood), he acknowledged that, as the prosecutor put it in questioning the witness, "blue jean material is common material," so "this doesn't mean that the fibers that were all over the victim's clothing were necessarily from [House's] pair of blue jeans." On House's pants, though cotton garments both transfer and retain fibers readily, Agent Blythe found neither hair nor fiber consistent with the victim's hair or clothing.

126 S. Ct. at 2073 (citation to record omitted).

Petitioner alleges that Agent Blythe misled the jury with respect to his comment that Mrs. Muncey's nightgown was nylon and thus would not transfer very easily, and his failure to mention that her panties, housecoat, and bra were all made of cotton, which would transfer easily. Petitioner argues that this deception violated the Supreme Court's holding that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

In order to state a *Giglio* claim, however, petitioner must demonstrate "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). Furthermore, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id*. Under the circumstances, the court does not find that Agent Blythe's testimony was false or so misleading as to state a claim for relief under *Giglio*.

Petitioner, therefore, is not entitled to summary judgment on his allegation of a *Giglio* violation, as set forth in claim 41, nor is he entitled to summary judgment on his allegation of ineffective assistance of counsel for failure to discover false evidence, as set forth in claim 58. Under the circumstances, however, the court is constrained to conclude that petitioner *is* entitled to summary judgment on his remaining claims.

The DNA testing, which showed that the semen stains found on Mrs. Muncey's clothing claim were from her husband, would not, of course, have been available to defense counsel at the time of trial. The fact that Mr. Muncey had sex with his wife the

morning of her murder, however, would have assisted defense counsel in refuting the prosecution's theory that the semen came from petitioner. Thus, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution should have disclosed the report that the Munceys had sex that morning.

FBI Special Agent Paul Bigbee testified at trial regarding the semen stains on Mrs. Muncey's clothes. The respondent argues that Agent Bigbee's testimony was ambiguous as to how long the semen had been on the clothes, and therefore the information that the Munceys had sex that morning was neither exculpatory nor impeaching, and thus not subject to disclosure under *Brady*. The respondent also argues that the evidence that the Munceys had sex that morning does not lessen the likelihood that petitioner committed the murder. The Supreme Court disagreed. "When the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking House to the crime." 126 S. Ct. at 2079.

The respondent further argues that there is no proof that defense counsel did not receive the report since he merely testified at the evidentiary hearing that he could not remember ever having seen the report. In the event trial counsel *was* provided the report, however, his failure to utilize the report at trial would have constituted ineffective assistance of counsel under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984).

The fact that no blood was found on petitioner's shoes would also have been relevant to his defense, especially since blood was found on the hem of petitioner's blue jeans.

> As Turner informed the jury, House's shoes were found several months after the crime in a field near her home. Turner delivered them to authorities. Though the jury did not learn of this fact (and House's counsel claims he did not either), the State tested the shoes for blood and found none.

126 S. Ct. at 2073. The prosecution should have disclosed the TBI report in this regard.

Again, the respondent argues that there is no proof that defense counsel did not receive the report since he merely testified at the evidentiary hearing that he could not recall ever having seen the report. Again, however, in the event trial counsel *was* provided the TBI report, his failure to utilize the report at trial would have constituted ineffective assistance of counsel under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984).

The respondent also argues that the absence of blood on the tennis shoes was immaterial under *Brady*, given the condition of the shoes when they were found, their four-month exposure to the elements, and the circumstances and timing surrounding their discovery, which was known to the jury at trial. The condition of the shoes would have gone to the weight of the evidence, however, not to whether it should have been disclosed under *Brady*.

Finally, with respect to petitioner's *Brady* claim as to the spillage of blood in the styrofoam box, the prosecution should have disclosed, and trial counsel should have discovered, the mishandling of the blood evidence by the authorities. "[W]e think the evidentiary disarray surrounding the blood, taken together with Dr. Blake's testimony and the limited rebuttal of it in the present record, would prevent reasonable jurors from placing significant reliance on the blood evidence." 126 S. Ct. at 2083.

Petitioner also alleges his trial counsel was ineffective by failing to call all available witnesses that would have been of benefit to the defense. Counsel did present proof of Mr. Muncey's abuse of Mrs. Muncey through the testimony of her brother. However, there were other witnesses who could have corroborated that testimony, as well as cast suspicion on Mr. Muncey as the actual killer.

> At trial, as has been noted, the jury heard that roughly two weeks before the murder Mrs. Muncey's brother received a frightened phone call from his sister indicating that she and Mr. Muncey had been fighting, that she was scared, and that she wanted to leave him. The jury also learned that the brother once saw Mr. Muncey "smac[k]" the victim. House now has produced evidence from multiple sources suggesting that Mr. Muncey regularly abused his wife. For example, one witness — Kathy Parker, a lifelong area resident who denied any animosity towards Mr. Muncey — recalled that Mrs. Muncey "was constantly with black eyes and busted mouth." In addition Hazel Miller, who is Kathy Parker's mother and a lifelong acquaintance of Mr. Muncey, testified at the habeas hearing that two or three months before the victim's death Mr. Muncey came to Miller's home and "tried to get my daughter [Parker] to go out with him," (Parker had dated Mr. Muncey at age 14.) According to Miller, Muncey said "[h]e was upset with his wife, that they had had an argument and he said he was going to get rid of that woman one way or the other."
>
> Another witness — Mary Atkins, also an area native who "grew up" with Mr. Muncey and professed no hard feelings — claims she saw Mr. Muncey "backhan[d]" Mrs. Muncey on the very night of the murder. Atkins recalled that during a break in the recreation center dance, she saw Mr. Muncey and his wife arguing in the parking lot. Mr. Muncey "grabbed her and he just backhanded her." After that, Mrs. Muncey "left walking." There was also testimony from Atkins' mother, named Artie Lawson. A self-described "good friend" of Mr. Muncey, Lawson said Mr. Muncey visited her the morning after the murder, before the body was found. According to Lawson, Mr. Muncey asked her to tell anyone who inquired not only that she had been at the dance the evening before and had seen him, but also that he had breakfasted at her home at 6 o'clock that morning. Lawson had not in fact been at the dance, nor had Mr. Muncey been with her so early.

*Id.* at 2083-84 (citations to record omitted).

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id.* at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

Generally, the failure to call witnesses who are cumulative does not constitute ineffective assistance of counsel. *See, e.g., United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (failure to present potential witnesses who are cumulative, or unreliable and

subject to impeachment, does not constitute ineffective assistance of counsel). In a case such as this one, however, where the only evidence against petitioner was circumstantial and the theory of the defense was to shift suspicion from petitioner to the victim's husband, it was incumbent on counsel to discover and present all witnesses who could testify as to the husband's abuse of his wife and thus lend credence to the defense theory.

The court concludes that counsel was deficient in failing to discover the aforementioned witnesses and the petitioner was clearly prejudiced by counsel failure in that regard. Petitioner was denied a fair trial, a trial whose result was reliable, and thus has met both prongs of the *Strickland* standard.

## IV. CONCLUSION

Based upon the record as a whole, and in light of the Supreme Court's ruling, this court is constrained to conclude that the petitioner is entitled to judgment as a matter of law on several of his claims, and his motion for summary judgment will be **GRANTED IN PART AND DENIED IN PART**. Petitioner is entitled to a new trial on all the evidence and therefore will be **GRANTED** a conditional writ of habeas corpus that will result in the vacation of his conviction and sentence unless the State of Tennessee commences a new trial against him within 180 days after this judgment becomes final.

**A SEPARATE ORDER WILL ENTER.**

                                          */s/Harry S. Mattice, Jr.*
                                          HARRY S. MATTICE, JR.
                                          UNITED STATES DISTRICT JUDGE